UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

GREGG GALLAGHER and,
LESLIE GALLAGHER,

              Plaintiffs,                        Case No. 1:11-CV-1356

v.

                                                        HON. GORDON J. QUIST

BAC HOME LOANS SERVICING, L.P.,

              Defendant.
_____/

**OPINION**

       Plaintiffs, Gregg and Leslie Gallagher, filed a seven-count complaint against BAC Home Loans Servicing, L.P. This case has its roots in the nation's financial struggles: like too many, the Gallaghers' family income suffered as a result of the depressed economy and, in turn, the Gallaghers fell behind on their mortgage payments. Like many foreclosed-upon homeowners have experienced with numerous lenders and servicers, BAC and its agents handled the Gallaghers' mortgage in a convoluted manner. Eventually, BAC foreclosed upon the Gallaghers' home, which ended in a sheriff's sale. The Gallaghers filed suit shortly before the six-month redemption period expired in an attempt to set-aside the foreclosure sale so that they can remain in their home with their two children. The Gallaghers have continuously stated their willingness and exhibited their ability to resume normal payments on their mortgage, as evidenced by monthly deposits with their counsel. Apparently, BAC finds it more beneficial to finish the foreclosure process by defending this lawsuit.

       The Gallaghers filed their complaint in state court, but BAC removed the complaint to this Court. The Gallaghers' seven-count complaint alleges: wrongful foreclosure for failure to comply

with various provisions of Michigan's foreclosure statute (Counts 1, 2, & 3); breach of contract (Count 4); breach of the duty of good faith and fair dealing (Count 5); promissory estoppel (Count 6); and quiet title (Count 7).  BAC has filed a Motion to Dismiss.  (Docket no. 10.)  The Gallaghers have filed a response, to which BAC replied.  (Docket nos. 14 & 15.)  For the reasons discussed below, BAC's motion will be denied as to Counts 1, 4, 5, and 7, but granted as to Counts 2, 3, and 6, which will be dismissed.

## I. Background

The following factual background comes from the allegations in the Gallaghers' complaint and the attached exhibits.[1]

On May 1, 1996, the Gallaghers purchased a home at 1129 Lakeside Drive, East Grand Rapids, Michigan.  The Gallaghers and their two children still live at this location.  To purchase the home, the Gallaghers' obtained a loan, secured by a mortgage on the property.  In 2002, Gregg Gallagher refinanced their loan with Republic Bank, once again secured by a mortgage on their property.  Mortgage Electronic Registration Systems, Inc. (MERS), was the mortgagee, acting solely as nominee for Republic Bank and its successors and assigns.  Republic Bank, or one of its agents, recorded the mortgage in the Kent County Register of Deeds.

On September 14, 2010, MERS assigned the mortgage to BAC.  The assignment was recorded in the Kent County Register of Deeds.  (Compl. ¶ 13 & Ex. D, Assignment from MERS to BAC.)

---

[1] Although a court is normally precluded from considering matters outside of the pleadings in addressing a motion under Rule 12(b)(6), courts recognize an exception for documents attached to or referenced in the complaint. "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

The parties have some dispute over which documents this Court may consider for this motion.  When considering a document outside of the complaint or not attached as an exhibit to the complaint, the Court will note its basis for doing so.

The promissory note required the Gallaghers to repay their loan in 360 monthly payments of $911.42, due on the first day of each month. The Gallaghers' payment did not include escrow for homeowner's insurance or property tax. The Gallaghers timely paid their mortgage until 2009. Neither MERS nor BAC have ever owned or held the promissory note. (*Id*. ¶ 14.)

The Gallaghers had economic struggles beginning in 2007. In February 2007, Leslie lost her job with D.A. Blodgett – an entity that provides social services to her community and beyond. Leslie's efforts to find a new job were at first unsuccessful, so in the meantime she obtained unemployment benefits from the State of Michigan. In November 2010, Leslie finally found a part-time position with Bethany Christian Services – another social services entity that serves her community. In March 2009, Gregg's company, Superior Environmental Corporation, had to confront the effects of the depressed economy; it reduced Gregg's compensation by 12 percent, which remains in effect.

Although the Gallaghers remained current with their mortgage until 2009, they were not able to remain current with their real estate taxes. In early 2009, BAC learned that the Gallaghers were delinquent on their taxes. BAC paid the Gallaghers' back taxes and imposed an escrow requirement for the Gallaghers' property taxes and homeowner's insurance. Due to the escrow requirement, the Gallaghers' monthly payment increased from $911.42 to $1,341.45, an increase of around 47 percent. (*Id*. ¶ 25.)

The Gallaghers fell behind on their mortgage payments because they could not afford their new monthly payment of $1,341.45. In July, 2009, BAC notified the Gallaghers that it intended to accelerate the amount due under the note unless the Gallaghers paid $9,422.57 – the amount that the Gallaghers were behind on the note.

3

On August 1, 2009, the Gallaghers finally received some good news.  BAC sent the Gallaghers a letter informing the Gallaghers that they were eligible for a reduced mortgage payment for up to six months.  (*Id*. Ex. E at 1.)  BAC's letter came with a HomeSaver Payment Forbearance Agreement (the "Forbearance Agreement").  (*Id*. Ex. E at 2-4.)  The Forbearance Agreement allowed the Gallaghers to pay a reduced payment of $671.53, for the six-month period of September 1, 2009, through February 1, 2010 (the "Deferral Period").  The Forbearance Agreement said that BAC would suspend any foreclosure sale as long as the reduced monthly payments were made.  The Forbearance Agreement also states that, during the Deferral Period, BAC would review the Gallaghers' loan to determine whether additional default resolution assistance could be offered.  It also states that, at the end of the six-month period, one of five alternatives would apply, including the possibility that BAC would offer to modify the loan or offer some other form of assistance.

On August 6, 2009, Gregg signed both copies of the Forbearance Agreement and returned them to BAC.  BAC never returned a signed copy of the Forbearance Agreement.  The Gallaghers timely made all six $671.53 payments, ending on February 1, 2010.

On May 28, 2010, the Gallaghers received a statement from BAC indicating that their next mortgage payment would resume to its previous amount, $1,341.45, due on June 1, 2010, and that the past due amount as of the statement was $10,490.62.

But again, with bad news came good news.  On June 9, 2010, Gregg received a letter from BAC informing him that he may be eligible for the Home Affordable Modification Program (HAMP).  (*Id*. Ex. F.)  The letter included a HAMP application.

On June 28, 2010, BAC wrote to Gregg informing him that BAC had received the last installment payment under the Forbearance Agreement.  (*Id*. Ex. G.)  The letter states: "Thank you

for fulfilling this commitment.  You are now up to date and current on your home loan payments.

You can resume making your normal monthly payments."  (*Id.*)

On July 7, 2010, the Gallaghers sent the HAMP application and all required documents to

BAC.  On or about July 16, 2010, BAC acknowledged receipt of the Gallaghers' HAMP application

and requested some additional documentation.  The Gallaghers sent the additional documentation

to BAC on or about July 20, 2010.

On July 29, 2010, BAC sent a statement to the Gallaghers informing them that they had to

pay $1,341.45 on August 1, 2010, and that they had a past due amount of $13,173.52.

On August 23, 2010, BAC sent a letter to Gregg stating "This may be your last option to

avoid foreclosure."  (*Id*. Ex. H.)  The letter solicited a signed Deed in Lieu of Foreclosure

Agreement, which the letter states "is commonly known as 'handing over the keys.'" (*Id.*)

On August 24, 2010, BAC informed the Gallaghers that their monthly mortgage payment

had increased.  The letter said that on September 1, 2010, the Gallaghers had to make a payment of

$1,620.96, and that the past due amount was $13,430.56.

On September 20, 2010, BAC acknowledged receipt of the Gallaghers' HAMP application

and promised a response within thirty days.  Only four days later, on September 24, 2010, BAC

informed the Gallaghers that their "loan is not eligible for a Home Affordable Modification" because

the Gallaghers housing expense was allegedly less than 31 percent of their gross monthly income.[2]

On September 21, 2010, BAC's foreclosure attorneys, Trott & Trott, mailed the Gallaghers

a letter pursuant to M.C.L. § 600.3205a(1), which stated that the Gallaghers owed $155,314.76 on

---

[2] The Gallaghers state that their gross monthly income at that time was $4,958.67.  Also, at that time, their monthly mortgage payment required by BAC was $1,620.96, which is greater than 31 percent of their gross monthly income.  The Gallaghers do not allege, however, what mortgage payment BAC used to calculate its numbers.

their loan.  (*Id.* Ex. I.)  The letter informed the Gallaghers that they had the right to "request a meeting . . . to attempt to work out a modification of the mortgage loan to avoid foreclosure by contacting a housing counselor from the list provided with this notice."  The letter states that a list of housing counselors was enclosed.  However, no such list was enclosed.  (*Id.* ¶ 51.)  Still, within 14 days of receiving the letter, Gregg requested a meeting with BAC's agent, Trott & Trott.  (*Id.* ¶ 52.)  Gregg's request went unanswered.

On September 28, 2010, Leslie attended an event at DeVos Performance Hall in Grand Rapids, Michigan, which was designed to provide homeowners with information regarding alternative loan assistance programs to avoid foreclosure.  She met with BAC's representative, a woman named Janice who would not reveal her last name.  Janice told Leslie that the Gallaghers should have been approved for the HAMP program, but said that BAC never received their application.  Leslie's attempts to tell Janice otherwise were futile.  Leslie drove home, retrieved all of their information and documentation, and returned to DeVos Hall along with Gregg to once again meet with Janice.  The Gallaghers watched Janice fax the documentation to the appropriate department.  Janice provided the Gallaghers with the information of Money Management International (MMI), to conduct financial counseling.  According to MMI, the Gallaghers' mortgage payment was 61 percent of their monthly net income.  Nothing came about from the Gallaghers' HAMP application submitted through Janice.

Within 90 days of the letter that BAC sent to the Gallaghers pursuant to M.C.L. § 600.3205a(1), BAC commended foreclosure proceedings.  For four consecutive weeks, beginning on October 20, 2010, BAC caused a foreclosure notice to be published in the Grand Rapids Legal News.  Gregg dutifully requested delays in the foreclosure sale, typically for two week intervals.  On May 18, 2011, the non-judicial foreclosure consummated in a sheriff's sale.

The notice of mortgage sale and all other documents related to BAC's non-judicial foreclosure misspelled the Gallaghers' last name as G-A-L-L-A-C-H-E-R, rather than the name "Gallagher," as it appears on the mortgage and the note.  (*See id*. Ex. J, Notice of Mortgage Foreclosure Sale recorded with Kent County Register of Deeds.)

Interestingly, the Gallaghers have continued to make an effort to fulfill their original promise–i.e., to pay BAC the money that BAC had loaned the Gallaghers.  As evidence, the Gallaghers have provided their attorney with a monthly check in the amount of $1,211.42,[3] which commenced a week before filing this action.  The Gallaghers' counsel deposits the check into his client trust account.  The Gallaghers allegedly have continued and will continue to make this payment on the first of each month during the pendency of this litigation.  Should the Court set aside the sheriff's sale, the Gallaghers pledge to pay these funds to BAC.  (*Id*. ¶ 80.)

## II. MOTION STANDARD

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65; *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.  "A

---

[3] This amount reflects the Gallaghers' monthly mortgage payment of $941.42 and an escrow amount of $300 per month for property taxes.

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949.

## III. ANALYSIS

### A.   Violation of Michigan's Foreclosure Statute

On November 11, 2011, the Gallaghers filed their complaint seeking to set aside BAC's foreclosure by advertisement. Seven days later, on November 18, 2011, the Gallaghers' six-month redemption period expired. Counts 1, 2, and 3 allege wrongful foreclosure due to violations of Michigan's Foreclosure by Advertisement statute. M.C.L. § 600.3204, *et seq.*

BAC argues that the Gallaghers do not have "standing" to assert a claim for wrongful foreclosure because the Gallaghers' six-month redemption period has expired. With regards to Article III considerations, BAC's argument fails because the Gallaghers' have standing to challenge BAC's foreclosure. *See Langley v. Chase Home Fin., LLC*, 2011 WL 1130926, at *2 n.2 (W.D. Mich. Mar. 28, 2011). Despite the Gallaghers' lengthy argument addressing Article III standing, the argument that BAC asserts goes to whether the Gallaghers' have statutory standing.

"If the mortgagor does not redeem the property within the requisite period, the purchaser of the sheriff's deed is vested with 'all the right, title, and interest' in the property." *Awad v. GMAC*, 2012 WL 1415166, at *2 (Mich. Ct. App. Apr. 24, 2012) (per curiam) (citing *Piotrowski v. State Land Office Bd.*, 302 Mich. 179, 187, 4 N.W.2d 514, 517 (1942)). "The law in Michigan does not allow an equitable extension of the period to redeem from a statutory foreclosure sale in connection with a mortgage foreclosed by advertisement . . . in the absence of a clear showing of fraud, or irregularity." *Id.* (quotation omitted). "The *Piotrowski* standard has consistently been applied by Michigan state and federal courts to bar former owners from making any claims with respect to

foreclosed property after the end of the redemption period." *Snell v. Wells Fargo Bank*, 2012 WL 1048576, at *2 (E.D. Mich. Mar. 28, 2012) (citing cases). Moreover, the filing of a lawsuit prior to the expiration of the redemption period is insufficient to toll the redemption period. *See Awad*, 2012 WL 1415166, at *4.

Thus, since the Gallaghers' redemption period has expired, the Gallaghers cannot challenge the foreclosure unless they make a clear showing of fraud or irregularity in the foreclosure process. Counts 1, 2, and 3 allege irregularities in the foreclosure proceedings.

1.     Violation of M.C.L. § 600.3204(4) (Count 1)

Count 1 alleges that BAC failed to comply with M.C.L. § 600.3204(4) and, therefore, BAC should not have commenced proceedings to foreclose. In relevant part, M.C.L. § 600.3204(4) states:

> A party shall not commence proceedings under this chapter to foreclose a mortgage
> . . . if 1 or more of the following apply:
> . . .
>
> (c)     Within 14 days after a notice is mailed to the mortgagor under section 3205a, the mortgagor has requested a meeting under section 3205b with the person designated under section 3205a(1)(c) and 90 days have not passed after the notice was mailed.
>
> (d)     The mortgagor has requested a meeting under section 3205b with the person designated under section 3205(a)(1)(c), the mortgagor has provided documents if requested under section 3205b(2), and the person designated under section 3205a(1)(c) has not met or negotiated with the mortgagor under this chapter.

M.C.L. § 600.3204(4)(c) & (d) (effective July 5, 2009; repealed effective January 5, 2012).

With regards to § 600.3204(c), the Gallaghers allege that on September 21, 2010, BAC's foreclosure attorneys, Trott & Trott, mailed the Gallaghers a letter pursuant to M.C.L. § 600.3205a(1). The letter states that the agent designated by BAC to contact and that has the authority to make agreements under M.C.L. §§ 600.3205b & 600.3205c is Trott & Trott. Within 14 days, Gregg requested a meeting with Trott & Trott under § 600.3205b. (Compl. ¶ 52). Because

of Gregg's request, pursuant to M.C.L. § 600.3204(4)(c), BAC had to wait 90 days after the notice was mailed to commence foreclosure proceedings. Despite Gregg's request, however, on October 20, 2010, BAC caused a foreclosure notice to be published in the Grand Rapids Legal News. Thus, taking these allegations as true, BAC violated M.C.L. § 600.3204(4)(c) because 90 days did not pass after the notice was mailed but before BAC commenced foreclosure proceedings. Therefore, BAC should not have commenced foreclosure proceedings.

Similarly, as to § 600.3204(4)(d), the Gallaghers allege that neither BAC nor its agents negotiated or met with the Gallaghers, despite the Gallaghers' request to have such a meeting. Therefore, taking the allegations in the complaint as true, BAC also violated § 600.3204(4)(d) because Trott & Trott did not negotiate or meet with the Gallaghers after they requested a meeting. Again, taking the allegations in the complaint as true, BAC should not have commenced foreclosure proceedings.

BAC argues that Gregg did not request a meeting with BAC or its agent within 14 days and, therefore, BAC was allowed to commence foreclosure proceedings after 14 days had expired without negotiating with him. (Def.'s Br. at 13.) Bree Stocker, an attorney for Trott & Trott, filed an "Affidavit of MCL 600.3205 Notice," attesting that Gregg did not request a meeting within the required time. (Compl. Ex. J ("That the time for a housing counselor to notify the person designated under MCL 600.3205a(1)(c) of a request by the borrower(s) has expired without a request for a meeting.").) However, it is not appropriate for this Court to decide a factual dispute on this motion. Taking as true the facts in the complaint, within 14 days, Gregg did, in fact, request a meeting with Trott & Trott. (*Id.* ¶ 52.) This triggered two conditions before BAC could commence nonjudicial foreclosure proceedings: 1) BAC had to wait 90 days, *see* M.C.L. § 600.3204(4)(c), and, 2) Trott & Trott had to meet or negotiate with Gregg, *see* M.C.L. § 600.3204(4)(d). According to the

Gallaghers, neither of these conditions occurred.  (*Id.* ¶ 89.)  Therefore, BAC should not have commenced nonjudicial foreclosure proceedings.

BAC also argues that the Gallaghers never contacted a housing counselor to negotiate a modification with Trott & Trott.  Pursuant to M.C.L. § 600.3205b(1), within 14 days of receiving Trott & Trott's notice, Gregg was required to contact a housing counselor from a list that was supposed to accompany the § 600.3205a notice.  According to the complaint, however, Gregg did not contact a housing counselor because the list of housing counselors was not attached to the § 600.3205a notice that they received.  Thus, taking the allegations in the complaint as true, BAC never sent a notice that complied with M.C.L. § 600.3205a(1).  In turn, failure to send a notice pursuant to § 600.3205(a)(1) is, itself, a possible violation of M.C.L. 600.3204(4).  Therefore, this Court is unwilling to accept BAC's argument that the Gallaghers' failure to contact a housing counselor is a reason to dismiss Count 1.

BAC also argues that the Gallaghers were not prejudiced by BAC's failure to comply with M.C.L. § 600.3204 or that BAC's failure to comply with the statute was inconsequential.  This Court disagrees.  "Had [BAC]'s agent honored [the Gallaghers'] request to meet to attempt to work out a modification of the mortgage loan to avoid foreclosure . . . [the Gallaghers] may have modified their mortgage loan or taken other steps to avoid foreclosure."  (Pls.' Resp. at 17.)  Indeed, the complaint describes the Gallaghers' numerous attempts and avid willingness to modify their loan or take any step to avoid foreclosure.  This opportunity was denied to the Gallaghers if BAC foreclosed upon the property without allowing adequate time for the modification process to occur.  While spelling the Gallaghers name incorrectly may seem inconsequential under some circumstances, the same cannot be said about cutting short the modification period.

11

In sum, Count 1 alleges irregularities in the foreclosure process.  Therefore, due to the

irregularities, according to the allegations in the complaint, the Gallaghers' redemption period is

tolled and all the right, title, and interest in the property has not vested with the sheriff's deed

purchaser.  Therefore, the Gallaghers can still challenge the BAC's nonjudicial foreclosure through

Count 1.

### 2.  Violation of M.C.L. § 600.3212(a) (Count 2)

In Count 2, the Gallaghers allege that BAC wrongfully foreclosed on their home because

many of the documents related to the foreclosure did not properly name the mortgagors.  M.C.L. §

600.3212(a) states that "[e]very notice of foreclosure by advertisement shall include . . . [t]he names

of the mortgagor, the original mortgagee, and the foreclosing assignee, if any."  M.C.L. §

600.3212(a).  Here, the Gallaghers allege that BAC violated this provision because each notice sent

to the Gallaghers misspelled their name G-A-L-L-A-C-H-E-R.

Count 2 is dismissed because the Gallaghers do not allege that they were prejudiced by

having their last name misspelled in a notice of foreclosure or any other document.[4]  *Worthy v.*

*World Wide Fin. Servs., Inc.*, 347 F. Supp. 2d 502, 511 (E.D. Mich. 2004) ("[E]ven if Defendant

failed to comply with the foreclosure notice statute, I would not have sufficient grounds to invalidate

the foreclosure sale, because of a lack of prejudice.") *aff'd and reasoning adopted by* 192 F. App'x

369 (6th Cir. 2006); *Sweet Air Inv., Inc. v. Kenney*, 275 Mich. App. 492, 503, 739 N.W.2d 656, 663

(2007) (dismissing a claim because the defendants could not show any prejudice from any alleged

---

[4] First, in the Gallaghers' response to BAC's motion, they state that, had their name not been misspelled, they *may* have received third party contacts that could have helped them.  Besides not being in the complaint, this allegation is conclusory and unsupported by any fact.  (Pls.' Resp. at 17.)

Second, the Gallaghers' complaint appears to contain other allegations of improper notice, such as failing to provide proper notice of adjournment.  However, those allegations, even if they had been contained in a claim, would fail for the same reasons as Count 2.

defect in the notice of adjournment as required under M.C.L. § 600.3220); *Jackson Inv. Corp. v. Pittsfield Prods., Inc.*, 162 Mich. App. 750, 755-56, 413 N.W.2d 99, 101-02 (1987).

Moreover, the misspelling of the Gallaghers' name is a slight and inconsequential mistake that under the circumstances of this case will not void the foreclosure sale. *Oades v. Standard Sav. & Loan Ass'n*, 257 Mich. 469, 472 241 N.W. 262, 263 (1932) (stating the rule that "slight and inconsequential irregularities in the notice will not vitiate" a foreclosure sale and, as an example of that rule, "a notice was held valid which named the mortgagor 'Dickson' as 'Dixon'" (citations omitted)); *see also Fox v. Jacobs*, 289 Mich. 619, 624, 286 N.W. 854, 856 (1939) (holding that a defect in a notice requirement does not render a foreclosure sale absolutely void, but only voidable).

### 3. Violation of M.C.L. § 600.3204(1)(d) (Count 3)

In Count 3, the Gallaghers allege that BAC did not have the legal authority to initiate foreclosure because BAC "is not the owner of the indebtedness and does not have an interest in the indebtedness" as required by M.C.L. § 600.3204(1)(d). (Compl. ¶ 98.) M.C.L. § 600.3204(1)(d) requires that "[t]he party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage." M.C.L. § 600.3204(1)(d).

Count 3 fails because BAC had an interest in the indebtedness. The complaint alleges that the assignment to BAC was filed with the Kent County Register of Deeds. (*Id.* ¶ 13 & Ex. D, Assignment from MERS to BAC.) Hence, taking the allegations in the complaint as true, BAC was the record holder of the Gallaghers' mortgage. The Michigan Supreme Court recently clarified that a record chain of title holder meets the requirements of M.C.L. § 600.3204(1)(d).

> [A]s record-holder of the mortgage, MERS owned a security lien on the properties, the continued existence of which was contingent upon the satisfaction of the indebtedness. This interest in the indebtedness–i.e., the ownership of legal title to

13

> a security lien whose existence is wholly contingent on the satisfaction of the indebtedness–authorized MERS to foreclose by advertisement under MCL 600.3204(1)(d).

*Residential Funding Co., v. Saurman*, 490 Mich. 909, 909, 805 N.W.2d 183, 183 (2011). Thus, BAC, as record holder of the mortgage, satisfied M.C.L. § 600.3204(1)(d) because it had an interest in the indebtedness. Therefore, Count 3 does not state a claim for which relief can be granted.

## B.    Breach of Contract (Count 4)

Count 4 alleges that BAC breached a contract with the Gallaghers. The Gallaghers allege that the Forbearance Agreement constituted a binding contract between the Gallaghers and BAC. BAC argues that the Forbearance Agreement did not require BAC to provide the Gallaghers with a permanent loan modification. But this is not what the Gallaghers allege in Count 4. (Pls.' Resp. at 20.) The Gallaghers allege that BAC "breached the contract by failing to *review* Mr. Gallagher's loan *to determine whether* additional default resolution assistance could be offered him." (Compl. ¶ 10 (emphasis added).) The Forbearance Agreement states that "[d]uring the Deferral Period, [BAC] will review my Loan to determine whether additional default resolution assistance can be offered to me." (*Id*. Ex. E at 3.) This is the clause that BAC allegedly breached and upon which Count 4 is based.

### 1.    *Form* of the Contract

BAC argues that the Gallaghers' breach of contract claim is barred by the statute of frauds. With regard to claims against financial institutions, Michigan's statute of frauds provides:

> (2) An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
>
> (a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.

14

(b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

(c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation.

M.C.L.A. § 566.132(2). This provision applies to actions against financial institutions based upon a promise to modify a loan and is "'unambiguous.'" *Ennis v. Wells Fargo Bank, N.A.*, 2011 WL 1118669, at *3 (W.D. Mich. Mar. 25, 2011) (quoting *Crown Tech. Park v. D & N Bank, FSB*, 242 Mich. App. 538, 550, 619 N.W.2d 66, 72 (2000)). "The statute operates as 'an unqualified and broad ban.'" *Id.* Moreover, it applies to any claim, regardless of the its label. *Crown Tech.*, 242 Mich. App. at 550, 619 N.W.2d at 72.

BAC contends that "the Forbearance Agreement cannot be enforced against [BAC] as the agreement was never executed by [BAC]." (Def.'s Mot. at 15.) In response, the Gallagher's assert that "[t]his is a factual question that cannot be resolved in the context of a motion to dismiss." (Pls.' Resp. at 20.) Upon first glance, the Gallaghers' assertion appears to be expressly controverted by the allegations in complaint, which states that "BAC never provided the Gallaghers with a signed copy of the Forbearance Agreement." (Compl. ¶ 35.) Indeed, looking solely at the Forbearance Agreement (compl. Ex. E at 2-4), the Gallaghers do not provide a copy that has a written signature of any BAC representative. But, both parties overlook the letter to which the Forbearance Agreement was attached. (Compl. Ex. E at 1.) That letter is signed by Jill Balentine, a Senior Vice President in the Home Retention Division of BAC. (*Id.*) The question becomes whether this signature satisfied the "authorized signature" requirement of the statute of frauds.

The Michigan Supreme Court has declined to adopt narrow and rigid rules for compliance with the statute of frauds, and has instead adopted a case-by-case approach. *Opdyke Inv. Co. v.*

*Norris Grain Co.*, 413 Mich. 354, 367, 320 N.W.2d 836, 841 (1982).  "[A] note or memorandum may be sufficient to satisfy the requirements of the statute of frauds even though it consists of several separate papers and documents, not all of which are signed by the party to be charged, and none of which is a sufficient memorandum in itself."  *Kelly-Stehney & Assoc., Inc. v. MacDonald's Indus. Prods., Inc.*, 265 Mich. App. 105, 113, 693 N.W.2d 394, 399 (2005) (quoting 4 Corbin, Contracts (rev. ed.) § 23.3, p. 771); *Miller v. Americor Lending Grp., Inc.*, 2007 WL 107664, at *3 (W.D. Mich. Jan. 9, 2007) (citing *Kelly-Stehney* and applying it to M.C.L. § 566.132); 11 Mich. Civ. Jur. Statute of Frauds § 110 (2012) ("A complete contract binding under the statute may be gathered from letters, writings, and telegrams between the parties relating to the subject matter of the contract, and connected with each other so that they may be said to constitute one paper relating to the contract." (citing *Ryan v. United States*, 136 U.S. 68, 83 10 S. Ct. 913, 918 (1890) and *Chronowski v. Park Sproat Corp.*, 306 Mich. 676, 684, 11 N.W.2d 286, 289 (1943))).  Whether a contract is signed depends on whether a person intended to authenticate a writing.  "[A]ny symbol executed or adopted by a party with the present intent to authenticate a writing may serve as a signature."  *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 87, 443 N.W.2d 451, 458 (1989). Whether a person intended to authenticate a writing is a question of fact.  *Id.*

When considering not only the Forbearance Agreement, (Compl. Ex. E at 2-4), but also the letter that accompanied the Forbearance Agreement (*id*. Ex. E at 1), the documents are so related and connected to each other that they constitute one paper relating to the contract.  For one, BAC sent the letter and the Forbearance Agreement together.  (*Id*. ¶ 29.)  In fact, the two writings are figuratively attached to each other; the bottom of the letter states that the Forbearance Agreement is an "attachment."  In addition, the letter and the Forbearance Agreement relate to the same matter: the Gallaghers' mortgage and the possibility of entering into the Forbearance Agreement with BAC.

16

The relatedness of the letter and Forbearance Agreement is exhibited by the fact that the letter contains contractual language; it explains to the Gallaghers to "[l]et us know if you accept this offer" and it tells the Gallaghers their next steps to enter into the Forbearance Agreement. Therefore, the documents should be considered together when determining if they satisfy the statute of frauds. By considering the documents together, the signature requirement is satisfied. Jill Balentine signed the letter to authenticate the documents as coming from a representative of BAC – she signed, included her official title, and indicated that she worked for BAC. Therefore, the statute of frauds does not preclude enforcement of the Forbearance Agreement simply because the Forbearance Agreement, itself, lacks a signature.

2.    *Substance* of the Contract

The question still remains whether the Gallaghers have alleged facts to draw a reasonable inference that the parties had a meeting of the minds to enter into a binding contract. *See Zurcher v. Herveat*, 238 Mich. App. 267, 279, 605 N.W.2d 329, 335 (1999) (explaining the difference between the *form* of a contract, which must satisfy the statute of frauds, and the *substance* of a contract, which "is a subject separate from [a contract's] sufficiency under the statute of frauds and one that is governed by the general contract law concept that there must be a meeting of the minds regarding the 'essential particulars' of the transaction"). In other words, even though Jill Balentine's signature satisfied the statute of frauds' signature requirement, it does not automatically mean that a contract had been formed. The Court must determine whether, taking the factual allegations in the complaint as true, an offer had been accepted and, hence, whether the parties had a meeting of the minds.

As a federal court sitting in diversity, this Court applies Michigan substantive law. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) ("Under the *Erie* doctrine,

17

federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law."). Under Michigan law, a binding contract requires an offer, acceptance, consideration, and "a meeting of the minds on all the essential terms." *Kloian v. Domino's Pizza L.L.C.*, 273 Mich. App. 449, 452-53, 733 N.W.2d 766, 770 (2006). Contracts should be construed to give effect to the intentions of the parties and to give a reasonable meaning to all provisions. *Klever v. Klever*, 333 Mich. 179, 186, 52 N.W.2d 653, 656-57 (1952). If the language of the contract is clear and unambiguous, the court should construe it according to its plain sense and meaning. *Grosse Point Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 198, 702 N.W.2d 106, 113 (2005).

BAC contends that Count 4 does not state a claim for which relief can be granted because a lack of a signature on the Forbearance Agreement forecloses it from becoming a binding contract. BAC points to the language of the Forbearance Agreement, which states that "[t]his Agreement will not take effect unless and until both I and the Servicer sign it and Servicer provides me with a copy of this Agreement with the Servicer's signature." (Compl. Ex. E at 2.) In addition, the Gallaghers pled that BAC did not return a signed copy of Forbearance Agreement. (*Id.* ¶ 35.)

The language that BAC relies upon in the Forbearance Agreement has been relied upon by numerous defendants in not only this district, but by many defendants throughout the country. This Court recently found that a similar, but not same, agreement did not ripen to an offer without the defendant-lender's signed and returned agreement. *See Brady v. Chase Home Fin., LLC*, Case No. 1:11-CV-838, Op. Granting Def.'s Mot. to Dismiss (W.D. Mich.) (docket no. 33). Many of the cases are very factually similar. However, each has its own distinguishing characteristics. In the instant case, the meaningful distinction comes in the language of the contract itself. BAC's reliance on the Forbearance Agreement's language must be read in conjunction with the sentence preceding the sentence upon which BAC relies. The Forbearance Agreement states:

18

> I understand that after I sign and return two copies of this Agreement to the Servicer, the Servicer *will* send me a fully executed copy of this Agreement.  This Agreement will not take effect unless and until both I and the Servicer sign it and Servicer provides me with a copy of this Agreement with the Servicer's signature.

(*Id*. Ex. E at 2 (emphasis added).)

This language created an offer because it gave the Gallaghers the power of acceptance.  "An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *DaimlerChrysler Corp. v. Wesco Distrib., Inc.*, 281 Mich. App. 240, 246, 760 N.W.2d 828, 832 (2008) (quotation and citation omitted); *Consumers Power Co. v. Amoco Prod. Co.*, 2000 WL 245438, at *3 (6th Cir. Feb. 24, 2000).

BAC's Forbearance Agreement constituted an offer because it expressed BAC's willingness to enter into an agreement and invited the Gallaghers' assent and indicated that their assent would complete the bargain.  According to the plain and ordinary terms of the contract, once the Gallaghers signed and returned two copies of the Forbearance Agreement, BAC promised to send them a fully executed copy of it.  While it is true that the Forbearance Agreement did not take effect until both the Gallaghers and BAC signed it and BAC provided the Gallaghers with a copy, BAC put the occurrence of that condition solely within the Gallaghers' power–i.e., once they signed and returned two copies of the agreement.

In addition, the letter to which the Forbearance Agreement was attached bolsters the conclusion that the Forbearance Agreement was an offer.  "In general, a court will look to the language of the proposal, then consider any prior communications coupled with the circumstances surrounding the bargain."  *Patrick v. U.S. Tangible Inv. Corp.*, 234 Mich. App. 541, 549, 595 N.W.2d 162, 167 (1999).  Here, BAC's letter states, in bold, "**Let us know if you accept this offer**."  (Compl. Ex. E at 1.)  Just as the Forbearance Agreement indicated, the letter told the

Gallaghers to sign and return the attached Forbearance Agreement and make the first monthly payment. Implicitly, the letter indicated that the Gallaghers' assent would complete the bargain. *See DaimlerChrysler*, 281 Mich. App. at 246, 760 N.W.2d at 832. Therefore, considering the language of the Forbearance Agreement and the surrounding communications, the Forbearance Agreement constituted an offer which the Gallaghers accepted when they signed and returned two copies of it to BAC.

BAC cannot claim that the parties never formed a binding contract because it did not perform a condition precedent–i.e., signing and returning a copy of the Forbearance Agreement to the Gallaghers. "Where conditions do exist in a contract, a promisor may not avoid liability by relying on the failure of a condition precedent where he or she has caused the failure." 5A Mich. Civ. Jur. Contracts § 165 (2012) (citing *Lee v. Desenberg*, 2 Mich. App. 365, 369, 139 N.W.2d 916, 918 (1966)). "[A] party must prevent the condition from occurring by either taking some affirmative action, or by refusing to take action required under the contract, before a court will find a waiver of a condition precedent." *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 132, 743 N.W.2d 585, 589 (2007) *appeal denied*, 481 Mich. 851, 747 N.W.2d 866 (2008); 5A Mich. Civ. Jr. Contracts § 165 (2012).

Here, even though the contract did not become effective until BAC performed a condition precedent (returning a signed copy), the contract *required* BAC to return a copy if the Gallaghers fulfilled their condition. Thus, once the Gallaghers signed and returned two copies of the Forbearance Agreement, the contract required BAC to return a signed copy of the Forbearance Agreement. Therefore, since BAC caused the failure of the condition precedent which it was *required* to perform, BAC cannot avoid liability by refusing to perform that condition. In sum, the Gallaghers have sufficiently alleged that a contract existed between the parties, which required

20

BAC, during the Deferral Period, to review the Gallaghers' loan to determine whether additional default resolution assistance could be offered to them.

BAC maintains that, even if a contract existed, BAC did not have to review the Gallaghers' loan because the Forbearance Agreement terminated after the Gallaghers did not timely make their payments in compliance with the Forbearance Agreement.  (Def.'s Mot. at 4.)  While BAC may be correct that the Forbearance Agreement terminated if the Gallaghers did not timely make the Deferral Period payment of $671.53, the complaint alleges that the Gallaghers timely made each payment.  (Compl. ¶ 36.)  Indeed, subsequent to the end of the Deferral Period, BAC sent a letter to the Gallaghers stating that the Gallaghers had fulfilled their commitment under the "Special Forbearance agreement." (*Id*. Ex. G.)  Moreover, that the Gallaghers remained in default under their original loan documents does not change this conclusion; the Forbearance Agreement contemplates that the Gallaghers might remain in default during the Deferral Period, and at the same time BAC would comply with the terms of the Forbearance Agreement.  Taking the factual allegations in the complaint as true, the Gallaghers timely made their Deferral Period payments and, therefore, BAC had to comply with the terms of the Forbearance Agreement during the Deferral Period.

Still, BAC argues that the Gallaghers' loan was reviewed for both a HAMP and internal modification.  (Def.'s Mot. at 16.)  BAC attaches two letters which were purportedly sent to Gregg informing the Gallaghers that their loan was reviewed but that they did not qualify for either a HAMP or internal loan modification.  (*Id*. Exs. 6 & 9.)[5]  Even though the HAMP letter suggests that the Gallaghers were considered for a loan modification, it does not establish, conclusively at least, that the Gallaghers were considered for a loan modification *during* the Deferral Period.  The

---

[5] For this motion, this Court can consider the letter denying the Gallaghers' a HAMP loan modification, (Def.'s Mot. Ex. 6), because it is referenced in the complaint, (Compl. ¶ 49), and central to the claims therein.  *See Bassett*, 528 F.3d at 430.  The other exhibit will not be considered because it is not referenced in the complaint.

Forbearance Agreement states that "*[d]uring* the Deferral Period," BAC would determine whether additional assistance would be offered. (Compl. Ex. E at 3.) At the very latest, the Deferral Period ended in early 2010. The HAMP letter was not sent until September 24, 2010. Thus, its not plausible that the HAMP letter was sent after a review that occurred during the Deferral Period.

In sum, BAC's motion will be denied as to Count 4 because it states a claim for which relief can be granted.

## C.    Breach of Duty of Good Faith and Fair Dealing (Count 5)

While "Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing," *Fodale v. Waste Mgmt. of Mich., Inc.*, 271 Mich. App. 11, 35, 718 N.W. 827, 841 (2006), every contract in which performance is left to a party's discretion is subject to an implied covenant of good faith. *Lowe's Home Ctrs., Inc. v. LL & 127, LLC*, 147 F. App'x 516, 523 (6th Cir. 2005); *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805, at * 7 (W.D. Mich. Aug. 25, 2011). "[W]here the manner of performance under a contract is left to the discretion of a party, that party may breach the contract by exercising its discretion in bad faith." *Lowe's*, 147 F. App'x at 523-24. Even though Count 5 does not state an independent claim, BAC's motion as to Count 5 will be denied because this claim will be permitted to proceed in conjunction with the Gallaghers' breach of contract claim. *See Darcy*, 2011 WL 3758805, at *8 (making this same finding with regard to a breach of duty of good faith and fair dealing claim).

## D.    Promissory Estoppel (Count 6)

In Count 6, the Gallaghers allege a claim of promissory estoppel, which seeks to enforce a different promise than the Gallaghers' breach of contract claim. The Gallaghers allege that BAC made representations that if the Gallaghers complied with all provisions of Forbearance Agreement, then the Gallaghers "would receive a permanent loan modification." (Compl. ¶ 119.) A claim of

promissory estoppel is an equitable remedy and requires that there be "(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of promisee, (3) which in fact produced reliance or forbearance . . . , and (4) in circumstances such that the promise must be enforced if injustice is to be avoided."  *Ardt v. Titan Ins. Co.*, 233 Mich. App. 685, 692, 593 N.W. 2d 215, 219 (1999).

Insofar as the Gallaghers are attempting to enforce an oral promise not contained in the Forbearance Agreement, their claim is barred by the statute of frauds.  M.C.L.A. § 566.132(2); *Crown Tech.*, 242 Mich. App. at 550, 619 N.W.2d at 72 (stating that the statute of frauds applies to any claim seeking to enforce an oral promise against a financial institution, regardless of its label). Moreover, insofar as the Gallaghers seek to enforce a written promise contained in the Forbearance Agreement, their claim is implausible given the plain language of the Forbearance Agreement, which states:

> **No Modification.  I understand that the Agreement is not a forgiveness of payments on my Loan or a modification of the Loan Documents.**  I further understand and agree that [BAC] is not obligated or bound to make any modification of the Loan Documents or provide any other alternative resolution of my default under the Loan Documents.

(Compl. Ex. E at 3.)  In other words, BAC, through the Forbearance Agreement, expressly disavowed any promise to make a permanent modification upon expiration of the Deferral Period. Therefore, Count 6 will be dismissed because it does not state a claim for which relief can be granted.

**E.**     **Quiet Title (Count 7)**

Count 7 states that BAC's "wrongful foreclosure has cast a cloud on the Gallaghers' title to their home" and that BAC's "claim to the Gallaghers' home is without any right whatsoever due to its wrongful foreclosure."  To set aside the foreclosure sale after the redemption period has expired,

23

the Gallaghers must allege a fraud or irregularity in the foreclosure proceedings.  Even though Count 7, itself, does not allege a fraud or irregularity in the foreclosure proceedings, Count 1 does, which would toll the redemption period.  Moreover, Count 1 is expressly incorporated into Count 7. (Compl. ¶ 126.)  In addition, the sheriff's deed purchaser, BAC, who believed that it obtained the title to the property upon the scheduled expiration of the redemption period, has a competing claim to title.  Therefore, since title will be quieted upon resolution of the allegations contained in the complaint, Count 7 will be allowed to proceed along with the remaining claims in the complaint. *See Republic Bank v. Modular One LLC*, 232 Mich. App. 444, 448, 591 N.W.2d 335, 337 (1998) (noting that the Michigan legislature "authorized suits to determine competing parties' respective interests in land"), overruled on other grounds by *Stokes v. Millen Roofing Co.*, 466 Mich. 660, 649 N.W.2d 371 (2002).  Thus, BAC's motion will be denied as to Count 7.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant BAC's motion to dismiss as to Counts 2, 3, 6, which will be dismissed.  The motion is denied as to Counts 1, 4, 5, and 7.

An Order consistent with this Opinion will enter.


Dated:  May 30, 2012                                        /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE